## Goldstein Estate

*Morton Meyers* and *Russell R. Yost,* for the accountants.

*Edward J. Harkins* and *Thomas A. Swope,* for Helen Goldstein, individually and as administratrix of the estate of Patricia D. Goldstein.

NELSON, P. J., December 10, 1954.—In 1931, Joseph Goldstein (hereafter referred to as Goldstein) pur-

chased an annuity contract from the Equitable Life Assurance Society of the United States. At the time of his death, the beneficiary was his daughter, Patricia D. Goldstein. The policy had been assigned by Goldstein to the Central-Penn National Bank of Philadelphia as security for an indebtedness, amounting, at the time of his death, to $49,974.50. After Goldstein's death, the bank surrendered the policy to the insurance company, and collected its indebtedness. There is a balance of $1,702.68 admittedly payable to the estate of Patricia. It is claimed on behalf of her estate that the obligation of Goldstein to the Central-Penn National Bank was a general obligation of his estate which should have been paid by the executors, thus making the full amount of the annuity contract available to Patricia's estate, without deduction for the indebtedness to the bank. The question is whether Patricia's estate gets $51,677.18 or $1,702.68.

From the evidence, we make the following

### Findings of Fact

1. On April 25, 1931, for a consideration of $54,-192.60, Joseph Goldstein purchased an annuity policy from the Equitable Life Assurance Society of the United States. The Equitable agreed to pay him $150.53 a month for life, commencing May 25, 1931, and on his death to pay the beneficiary $51,612, subject to his right to change the beneficiary, assign the policy or borrow against it.

2. The beneficiary was originally his first wife, Minnie, who predeceased him. After her death, the beneficiaries were their daughters, Miriam and Esther, until 1941 when the beneficiary was changed to Patricia, his daughter by a second marriage. Patricia died in 1951, aged 11 years, and her interest is now represented by her mother, Helen Goldstein, administratrix of her estate. Helen Goldstein was Goldstein's second wife whom he divorced.

3. The annuity policy reserved to Goldstein all the rights of an owner, including the right to change the beneficiary and assign the contract. The insurance company agreed to make loans on the security of the policy at six percent interest. The contract contains the following provision with respect to an assignment:

"The Annuitant (or assignee, if any, of all rights under this contract) may, without the consent of the beneficiary, surrender, assign or pledge this contract and all rights thereunder, or, subject to the Society's approval, change to another form or plan of contract. An assignment of all rights under this contract by the Annuitant shall operate to exclude any and all rights of any beneficiary under this contract except that upon release of all outstanding assignments or upon reassignment to the Annuitant all rights under this contract shall be the same as if such assignments of said contract had not been made and that if assigned or pledged as collateral only by the Annuitant any equity remaining at the death of the Annuitant shall accrue to the beneficiary." (Page 2 of the contract.)

4. On November 22, 1932, Goldstein made a policy loan of $20,000 from the insurance company at six percent interest. He made additional policy loans thereafter from the insurance company on the security of the policy. From November 22, 1932, until November 10, 1936, he at all times had policy loans from the insurance company on this policy at six percent interest. On November 10, 1936, the amount of the policy loans due the insurance company was $44,831.20.

5. On November 10, 1936, Goldstein borrowed $44,-831.20, the exact amount due the Equitable, from the Central-Penn National Bank, Philadelphia, at four percent interest, in order to pay off the policy loan due the Equitable on which he was paying six percent interest. The purpose was to save two percent interest. The bank sent its check to Equitable in payment of

the loan. As security for this loan Goldstein assigned the annuity policy to the bank.

6. On February 3, 1937, Goldstein borrowed $5,000 additional from the bank on the security of the policy making the total indebtedness $49,831.20.

7. In 1940 and 1941, Goldstein wished to change the beneficiary of the policy to his daughter, Patricia. In order to accomplish this, the bank had to release temporarily the assignment it held, because the policy provides: "If there is no written assignment of this contract in force and on file with the Society—the Annuitant may—change the beneficiary—" (page 2 of the policy). Goldstein requested the bank to release the assignment long enough to enable him to change the beneficiary and to take a new assignment thereafter to replace the one released. At first the bank refused, because there would have been a period intervening during which it would have had no security for its loan. Finally, however, it agreed.

8. On May 1, 1941, Goldstein's attorney in Philadelphia, who represented him then, sent to the Central-Penn Bank the following instruments signed by Goldstein in connection with the transaction:

(1). The request for change of beneficiary to Patricia Day Goldstein, dated April 29, 1941 (claimant's exhibit 7). (2). A new assignment of the annuity contract to take the place of the one released by the bank in order to permit the change of beneficiary to be made (estate's exhibit 4). (3). A letter from Goldstein dated April 28, 1941, to the Equitable Life Assurance Society of the United States, as follows (estate's exhibit 2):

"It is my desire and intention that the optional mode of payment contained in the beneficiary designation heretofore existing in connection with the above policy be cancelled. I also desire to state that the form of collateral assignment of the above contract which I have executed to the Central-Penn National Bank of

Philadelphia was given to the Bank to secure a debt in the present sum of $49,000.00.

"I direct you, in the event of my death, to make payment direct to the Bank of a sum sufficient to liquidate the then balance of principal and interest due upon said loan, and further direct that your Company shall pay the overplus then remaining to the then named beneficiary."

(4). The bank's form 513 (estate's exhibit 1), which provides:

"Said bank shall receive and apply on the indebtedness secured by said assignment (s) all sums paid under said policy (ies) at any time. Any balance remaining after said indebtedness has been fully paid shall be paid by said bank to the party or parties entitled to receive same under the terms of the said policy. No party interested in said policy (ies) shall, on account of the application of any of the proceeds of said policy-(ies) on said indebtedness, have the right to contribution or reimbursement from any party or to be subrogated to the rights of the bank in any other collateral."

9. The bank thereupon sent to the insurance company a release of its assignment and the request for a change of beneficiary to Patricia. The change of beneficiary to Patricia was noted on the policy by the insurance company on May 7, 1941. The bank retained the other two papers.

10. On May 16, 1941, Goldstein executed a new assignment to the Central-Penn National Bank dated after the date of the change of beneficiary on May 7, 1941 (claimant's exhibit 3). It assigns the contract to the bank "with all rights therein, and with all money now or hereafter due or payable thereon, and all defenses, options, benefits or advantages derived therefrom, including the right to surrender said policy at any time and to receive and receipt for the surrender value thereof".

11. On August 1, 1941, Goldstein executed a new note to the Central-Penn National Bank for $49,831.20 (claimant's exhibit 6). It was a consolidation of the two prior notes of $44,831.20 and $5,000. It was payable on demand after date with the annuity contract as collateral. It provides:

"If the undersigned—shall die—the obligation of the undersigned hereunder shall at once become due and payable."

12. On July 29, 1950, Joseph Goldstein executed a power of attorney to Morton Meyers appointing him his "universal agent" and authorized him to do anything that Goldstein could do himself (estate's exhibit 5).

13. On August 3, 1950, Morton Meyers went to Philadelphia at the request of Goldstein to review his affairs and rewrite his will. Goldstein was in the Jefferson Hospital at the time and was to be operated on a few days later. Morton Meyers discussed Goldstein's affairs with him, including this annuity contract. He went to the bank to discuss the matter with them and reported to Goldstein. He told him of the possibility of legal questions arising if the bank presented its claim on the note to the estate and if the executors were obliged to pay it. In that event the collateral would be released and Patricia would get over $51,000. Goldstein stated that this was not his intention, that he wanted the bank paid out of the collateral and that at most Patricia was to receive any equity remaining after the bank was paid. He authorized his agent to take whatever steps were necessary to accomplish this.

14. To avoid any possibility of Patricia's obtaining over $51,000, it was concluded to change the beneficiary by eliminating Patricia entirely and making Goldstein's estate the beneficiary. Goldstein directed Morton Meyers to go to the bank to accomplish this.

15. On August 4, 1950, Morton Meyers went to the Central-Penn National Bank and discussed this matter with Elwood K. Acker, vice president of the bank and senior lending officer. As such, Acker makes and renews loans, increases or decreases the amounts of loans, fixes interest rates, makes arrangements for payment of loans and for the method of payment of loans. These are his routine daily functions. Acker had handled this loan from the beginning.

16. Morton Meyers requested the bank to release its existing assignment so that the beneficiary could be changed and Patricia eliminated as beneficiary and the estate substituted. Acker refused to agree to release the assignment and take a new one as the bank had done in 1941, because there would have been an intervening gap of a few days during which it would have had no assignment. Goldstein's imminent operation made this too risky for the bank.

17. Whereupon Morton Meyers told Acker it would be necessary for Goldstein to pay off the note immediately so as to secure a release of the assignment and change the beneficiary, unless the bank agreed unconditionally to look solely to the collateral for payment of its indebtedness and not present a claim to the estate on the note. The collateral was worth more than the indebtedness.

18. On behalf of the bank, Acker did so agree without qualification, and the note was therefore not paid off by Goldstein.

19. This matter was reported by Morton Meyers to Goldstein, and he approved.

20. After Goldstein's death, the bank carried out its agreement, surrendered the policy and collected its note from the insurance company.

21. On August 4, 1950, Goldstein executed a will in which he provided as follows:

"Fourth: I give Fifteen Thousand ($15,000.00) Dollars to my executors in trust, to use for the benefit

of my daughter, Patricia, free of any tax. My executors shall invest this sum in such securities as they deem advisable, and pay a sum out or income of principal not exceeding Three Hundred Fifty ($350.00) Dollars a month, for her education, maintenance and welfare, until the fund is exhausted. I give my executors full discretion in determining how the funds shall be used.

"Seventeenth: I direct that my indebtedness to Central-Penn National Bank of Philadelphia be paid from collateral deposited by me to secure such indebtedness."

22. On August 8, 1950, Goldstein died. After his death payments were made on account of the legacy to Patricia by Goldstein's executors as follows:

October 11, 1950—Johnstown Bank and Trust Company, guardian of Patricia, $200.00.

Mar. 26, 1951—Johnstown Bank and Trust Company, guardian of Patricia, $1,272.64.

Sept. 29, 1951—Arizona Mortuary—to be applied on bequest as per decree of this court, $1,168.52.

Sept. 26, 1951—Helen Goldstein—expenses from Arizona to Johnstown for funeral of Patricia, as per decree of court, $400.00.

Sept. 18, 1952.—Helen Goldstein, administratrix of the estate of Patricia D. Goldstein—On account of legacy to Patricia, $500.00.

Total, $3,541.16.

### Discussion

When Goldstein purchased the annuity contract in 1931, he reserved to himself the incidents of ownership, including the right to assign the contract and change the beneficiary. As beneficiary, Patricia therefore had only an expectancy, not a vested interest: Bayer's Estate, 345 Pa. 308, 314. Her rights were subject to the terms of the contract, which provides:

"An assignment of all rights under this contract by the annuitant shall operate to exclude any and all

rights of any beneficiary under this contract except that upon release of all outstanding assignments or upon reassignment to the Annuitant all rights under this contract shall be the same as if such assignment of said contract had not been made and that if assigned or pledged as collateral only by the Annuitant any equity remaining at the death of the Annuitant shall accrue to the beneficiary."

Since this contract had been assigned by Goldstein as collateral for a loan, the beneficiary was entitled only to "any equity remaining at the death of the Annuitant". The term "equity" as used here means "the amount or value of a property or properties above the total of liens or charges": Webster's New International Dictionary 15 Words & Phrases, 133. Patricia's equity was the amount of the policy with accrued dividends, $51,677.18, less the lien of the bank, $49,974.50, or $1,702.68.

It is clear from the contract that this was Goldstein's contractual intent. This is controlling: Schwartz Estate, 369 Pa. 574, 580.

Other facts in the case indicate also that it was Goldstein's intent that Patricia obtain only the balance after the bank had been paid. At the time Patricia was made beneficiary in 1941, Goldstein executed several papers in connection with the assignment of the contract to the bank that define the terms of the assignment and indicate his intention. One (estate's exhibit 1) provides:

"Said bank shall receive and apply on the indebtedness secured by said assignment(s) all sums paid under said policy(ies) at any time. Any balance remaining after said indebtedness has been fully paid shall be paid by said bank to the party or parties entitled to receive same under the terms of said policy. No party interested in said policy(ies) shall, on account of the application of any of the proceeds of

said policy (ies) on said indebtedness, have the right to contribution or reimbursement from any party or to be subrogated to the rights of the bank in any other collateral."

When the bank collected its debt, the beneficiary was entitled only to the balance, without reimbursement from anybody. Patricia's rights as beneficiary are subject to the terms of the assignment.

In addition, when he delivered the assignment to the bank, he wrote to the insurance company:

"I direct you, in the event of my death, to make payment direct to the Bank of a sum sufficient to liquidate the then balance of principal and interest due upon said loan, and further direct that your Company shall pay the overplus then remaining to the then named beneficiary."

This is in accord with the terms of the policy itself which, as previously pointed out, provides that after an assignment as collateral the beneficiary is entitled only to "any equity remaining at the death of the Annuitant". He intended that Patricia get only what was left after the bank had been paid. His expressed intent in assigning the policy prevails: 2 Appleman on Insurance 718.

Moreover, any claim of Patricia's estate to the money paid by the insurance company to the bank must be based on the right of subrogation (i. e., substitution) to the claim of the bank against the executors. If the bank had no claim, Patricia succeeded to none: Fell v. Johnston et ux., 154 Pa. Superior Ct. 470, 472; Sivak Estate, 161 Pa. Superior Ct. 323, affirmed 359 Pa. 194. It is clear that prior to Goldstein's death the bank had agreed to look solely to the collateral for payment of its claim and therefore had no general claim against Goldstein's estate to which Patricia could be subrogated. Shortly before Goldstein's death, he attempted to change the beneficiary of the policy

from Patricia to his estate. The bank refused to release its assignment to permit this to be done. Goldstein, through his agent, informed the bank that he would pay off the note immediately, thus securing a release of the assignment, unless the bank agreed to look exclusively to the collateral in payment of its claim. The collateral was worth more than the indebtedness. The bank did so agree, and after Goldstein's death, carried out the agreement by surrendering the collateral to the insurance company and collecting its indebtedness from that source. It presented no claim on the note to the executors. While a promise without consideration by the holder of collateral to look exclusively to the collateral, and not to the debtor personally, cannot be enforced, it is binding where there is consideration: Union Trust Co. v. Long, 309 Pa. 470; National Bank of Fayette Co. v. Valentich, 343 Pa. 132, 135-136. There was both benefit to the promisor (it continued to receive interest on its note) and detriment to the promisee (he refrained from exercising his right to pay off a demand note). The bank therefore had no claim against Goldstein personally and there is nothing to which Patricia's estate can be subrogated.

Even if the bank had not so agreed, Patricia's estate could not recover. Goldstein borrowed originally from the insurance company at six percent interest. If this had been the situation when Goldstein died, Patricia would have been entitled only to the overplus: Schwartz Estate, supra. In order to save two percent interest Goldstein borrowed from the bank in 1936 at four percent, the exact amount necessary to pay off the insurance company. At the time of the assignment to the bank in 1941 Goldstein executed the papers previously referred to which express an intent that Patricia receive only the amount remaining after the bank had been paid. Under facts substantially the same as these, it was held in Fidelity Union Trust Co. v. Phillips, 5

N. J. Superior 529, 68 A. 2d 574, that the beneficiary had no claim against the executor. This case was relied on in Schwartz Estate, supra.

Much reliance is placed on a statement in Wilson's Estate, 363 Pa. 546. But in that case the court concluded that it was the insured's intent that the note be paid by the executors (p. 551). In the present case, the evidence is overwhelming that Goldstein intended the indebtedness to be paid out of the collateral and that Patricia receive only what remained. That intent prevails: Schwartz Estate, supra; Weissman Estate, 62 D. & C. 73; Price's Estate, 98 Pitts. L. J. 145.

In view of our conclusion, we find it unnecessary to consider the effect of the direction in Goldstein's will that the indebtedness to the bank be paid from the collateral securing it and the further question whether the estate of Patricia is estopped from challenging this direction by reason of having accepted a portion of the legacy of $15,000 bequeathed to her under the will.

We are of the opinion that the claim of the estate of Patricia must be disallowed.

### Decree

And now, December 10, 1954, it is ordered, adjudged and decreed:

(a) That the claim of Helen Goldstein, individually and as administratrix of the estate of Patricia D. Goldstein, against the estate of Joseph Goldstein for payment of $49,974.50, representing the indebtedness of decedent to the Central-Penn National Bank, Philadelphia, at the time of his death, be, and it is hereby disallowed.

This decree shall become final unless exceptions are filed within 10 days.